**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| BEVERLEY C. SALAHUDDIN THOMPSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-02094-TWP-MKK |
| | ) | |
| THE TRUSTEES OF INDIANA UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion for Summary Judgment filed by Defendant the Trustees of Indiana University ("the University") (Filing No. 242). Plaintiff Beverley C. Salahuddin Thompson ("Thompson") initiated this action after she was drugged, sexually assaulted, and left partially nude on Indiana University Bloomington's ("IU") campus. She claims the University violated Title VI of the Civil Rights Act and Title IX of the Education Amendments Act by discriminating against her because of her African American race and gender, and that the University intentionally inflicted emotional distress. She argues that she was denied and excluded from benefits of the University's educational programs; that the University violated several of its own policies, procedures, and practices; treated her worse than other similarly situated male or Caucasian students; and offered justifications for its conduct that are pretextual. Oral argument on the University's Motion for Summary Judgment was held on February 13, 2026 (Filing No. 310). For the reasons discussed below, the University's Motion for Summary Judgment is **granted**.

**I.    BACKGROUND**

The parties engaged in vast discovery and have presented extensive factual allegations and designations of evidence in support of their positions. For the purposes of this Order, the Court

summarizes only those facts relevant to the remaining claims and relevant to this decision. The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Thompson as the nonmoving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

A.    **Underlying Incident**

Thompson is a Black woman who in October 2021 was a 21-year-old student with a 3.778 GPA at IU. She planned to graduate a semester early, remain in Bloomington, and attend law school at IU Bloomington's Maurer School of Law in the fall of 2022.

On October 12, 2021, after taking the Law School Admission Test ("LSAT"), Thompson met friends at two downtown bars in Bloomington, Indiana, Upstairs Pub and Kilroy's (Filing No. 255-21 at 15). Video surveillance from the second bar, Kilroy's, shows Thompson and her friend walking around at 11:00 p.m. and leaving at 1:55 a.m. fully clothed (Filing No. 153-1 at 5). Video surveillance shows Thompson walking alone near Luddy Hall (on IU's campus) at 4:36 a.m. wearing only socks and a jacket. *Id.* at 4. A student jogger observed Thompson and called 911. *Id.* at 9. Indiana University Police Department ("IUPD") Officer Gunnar Ortlieb ("Officer Ortlieb") arrived and observed that Thompson was partially nude, disoriented, and unable to remember how she arrived there. *Id.* at 2. He observed that Thompson "had cockleburs all over her socks and embedded within her hair, consistent with having walked through and possibly fallen in heavy woods." (Filing No. 254-1 at 2). Officer Ortlieb requested that EMS respond to the scene, as the circumstances of Thompson's situation were then completely unknown. *Id.*

Thompson was transferred to Indiana University Health Bloomington Hospital ("IUH") by ambulance. *Id.* At the hospital, when she became more lucid, Thompson told Officer Ortlieb that

she had been out drinking with friends, celebrating completing the LSAT. *Id.* at 3. In his incident report created that night, Officer Ortlieb wrote that Thompson "recalls leaving Upstairs [Pub] with a group of friends, and remembers entering Kilroy's on Kirkwood, but does not recall any of her time in attendance at the facility." *Id.* Thompson did not recall ever leaving a drink unattended, nor had she recently taken any recreational drugs. *Id.* She recalled leaving her apartment to go to the bars at approximately 10:30 p.m., at which point she was fully dressed, but she was completely unaware of how her clothing was removed. *Id.* When asked, she responded that four to five months prior, a similar situation happened where she woke up confused in a friend's bed and had a six-hour loss of memory then as well. *Id.* Officer Ortlieb reported that Thompson's toxicology screening showed no drugs but a blood alcohol concentration ("BAC") of 0.298 percent. *Id.* Officer Ortlieb suspected that more than alcohol was involved, but he did not put that in his report. He was also informed by medical staff that date-rape drugs do not always appear in toxicology screens, but he did not put that information in his report either (Filing No. 166-3).

IUH's staff offered Thompson a sexual assault exam. Initially, Thompson refused the sexual assault nurse examiner ("SANE") examination offered by the hospital, but later that afternoon, when she was more coherent—and concerned that she may have been assaulted—she consented (Filing No. 255-21 at 16). A trained forensic nurse performed a SANE exam and collected a sexual assault kit. IUPD retrieved this sexual assault kit the same day and secured it in its evidence room. Thompson chose, at that time, not to report to law enforcement any allegations of sexual assault. *Id.* As part of the SANE exam, Thompson signed and initialed an "Anonymous Form," which stated:

> Indiana Law gives you the right to have a medical-forensic exam where specimens and clothing may be collected even if you choose not to report to law enforcement at this time. . . . By law, the sexual assault (SA) kit . . . will be held for one year (365 days). If you decide not to report the crime to law enforcement within 365

3

days of the exam, the SA kit . . . may be destroyed. Your SA kit will not have your identifying information on it and will be stored by the law enforcement agency that maintains jurisdiction of where the crime took place. No criminal investigation will occur unless you choose to report to law enforcement. Please initial each statement below. I have chosen not to report to law enforcement at this time. . . . . I understand that I may report the crime to law enforcement within one year of my exam. I understand that if I report to law enforcement, I will need to inform them that the SA kit . . . [was] collected at Indiana University Health Bloomington Hospital. I understand that the SA kit of forensic specimens . . . collected today will be held for one year and may be destroyed if I do not report to law enforcement. I understand that the SA kit will not have my identifying information on it. I understand that I will not be informed if my kit is destroyed by law enforcement if I have not reported within the allotted time of one year. I understand that no criminal investigation will occur unless I choose to report to law enforcement. My SA kit identification (Case Number) is …

*Id.* at 36. Later that day, IUPD Officer Mark Norris ("Officer Norris") picked up an anonymous sexual assault kit from IUH. As per the Monroe County Sexual Assault Response Team ("SART") Protocol, the kit had no identifying information regarding the identity of the victim or when or where the alleged sexual assault occurred (Filing No. 255-7 at 1).

IU students are subject to a Code of Student Rights, Responsibilities, and Conduct ("the Code"), which requires that "[s]tudents are responsible for their behavior, and are expected to respect the rights and dignity of others both within and outside of the [IU] community." (Filing No. 243-4). The Code provides that the University may "discipline a student [] for acts of personal misconduct that occur on or off university property," such as: (1) public intoxication; (2) endangering oneself or others; and (3) conduct that is lewd, indecent, or obscene or is in violation of the Sexual Misconduct Policy. *Id.* Shortly after the incident, the University's Office of Student Conduct ("OSC") received a report from IUPD noting that Thompson had been found nude on campus with a 0.298 BAC. *Id.*; (Filing No. 243-9). The IUPD report did not mention that Thompson may have been sexually assaulted. Based on the report's description, student misconduct charges were initiated against Thompson (Filing No. 244-2).

4

In an October 21, 2021 letter sent via email, the OSC informed Thompson that she was being charged with three violations of the Code, including for lewd, indecent, or obscene conduct; personal misconduct that endangers oneself or others; and unauthorized use of alcoholic beverages for public intoxication on university property (Filing No. 268-2). The charging letter informed Thompson that a judicial conference was scheduled for October 27, 2021, at 10:00 a.m., and she should contact the hearing officer immediately if an academic conflict makes it impossible to attend. *Id.* The letter also informed Thompson that she could present and share any information and witnesses she has related to the incident, that a decision about responsibility may be determined, and, if appropriate, a sanction could be imposed. *Id.*

After reviewing the letter, Thompson retained Meggan Ehret ("Ehret") as her lawyer for the hearing (Filing No. 246 at 12). Ehret promptly contacted the University officials concerning the charges and informed them of Thompson's alleged sexual assault and that she thought Thompson should not be charged under the Code. She requested the meeting with OSC be cancelled (Filing No. 243-11). The University told Ehret that OSC had no record of Thompson's allegations of sexual assault and that Thompson needed to attend the hearing and tell OSC of such allegations herself (Filing No. 257-2 at 1).

The University has an amnesty policy which provides that "students who report an incident pursuant to [IU's UA-03 Policy] will not be disciplined by [IU] for violations of the [Code of Conduct] related to their drug and/or alcohol consumption in connection with the reported incident." (Filing No. 277-8 at 22). If a student falls under the amnesty policy, the University's practice is to "still meet with [students who have been granted amnesty] and . . . still refer them to resources, because . . . [IU] may have additional health and well-being concerns that they want to address." (Filing No. 243-8 at 62-65).

The University officials assigned to Thompson's disciplinary matter had the power to postpone the judicial conference, as requested by Ehret. Instead, the hearing was converted into a "meeting" that Thompson was required to attend (Filing No. 243-9). The University contends that it holds these meetings, which are not adjudicative, to connect students with resources or address concerns without generating any disciplinary record (Filing No. 243-8 at 62-65).

On October 27, 2021, the University officials, Thompson, and Ehret met regarding the incident and sexual assault allegations (Filing No. 255-6). The parties discussed the incident, and Thompson was questioned. Thompson stated that she consumed two gin and tonics and a shot of tequila at Upstairs Pub, that she did not buy drinks at Kilroy's, and that she did not recall any information after the group went to Kilroy's to get drinks. *Id.* She explained that when she woke up in the hospital, she hurt all over, she had bruising, her head hurt, and she had an anonymous sexual assault kit collected. *Id.* The University officials explained the amnesty process and the Title IX reporting process. Ehret pointed out that Thompson "had a SANE exam performed at the hospital and that the nurse at the hospital believed that [Thompson] was sexually assaulted." *Id.* Ehret asserted that the amnesty process does not apply because it requires wrongful conduct in the first place, which did not occur here. *Id.* Thompson confirmed in writing that she did not consent to the University investigating the alleged sexual assault because she did not trust IUPD (Filing No. 255-6). Thompson felt that the University officials were rude and accusatory during the meeting.

A few hours after the October 27, 2021 meeting, the Senior Associate Dean notified Thompson in writing that the disciplinary charges had been dismissed (Filing No. 244-2 at 6).

B.    **Sexual Assault Kit Facts**

Upon collection of Thompson's sexual assault kit, Thompson was asked if she wanted to report a possible crime to law enforcement. She understood that no criminal investigation would occur unless she chose to report it (Filing No. 246 at 13). Thompson was also informed in writing that the kit would be preserved for 365 days, after which time, if she did not want to report the incident to law enforcement, the kit may be destroyed (Filing No. 157-10 at 36). She was then given the assigned number and PIN associated with her anonymous kit.

Because the kit was anonymous, it did not contain any patient stickers or identifiers (Filing No. 246 at 14). An IUH nurse testified that they try to make the kit "as anonymous as possible." (Filing No. 243-15 at 72:18). Officer Norris confirmed that when he picked up the kit, it had no information on when or where the sexual assault took place (Filing No. 157-5 at 1). The kit was then placed into an IUPD evidence locker. *Id.*

On November 8, 2021, Ehret called the Indiana State Police ("ISP") to request that ISP handle the investigation of Thompson's sexual assault, as she was concerned about IUPD's handling of the investigation after the University charged Thompson under the Code (Filing No. 252, Ex. T at 00:42–2:02). Ehret explained that she was worried about video footage being lost because it had been almost a month since the alleged sexual assault, and Thompson was ready to report a sexual assault. *Id.* at 04:51–05:35. Ehret was told an ISP detective would call to arrange a time for Ehret and Thompson to come to ISP to make a statement. *Id.* at 05:52–06:56, 07:03–07:33.

On November 10, 2021, Ehret communicated with a detective at ISP, first by telephone and subsequently by email, that Thompson "ha[d] not reported the assault to law enforcement and, given [their] experience with [IU], [Thompson would] not report it to IUPD. It [was their] strong preference that Indiana State Police Department receive [Thompson's] report and investigate."

(Filing No. 257-33 at 1). Ehret gave ISP Thompson's name, the sexual assault kit identification number, the site of its collection, and the site of its storage. *Id.*

On November 11, 2021, IUPD Lieutenant Rebecca Ann Schmuhl ("Lieutenant Schmuhl") wrote a follow-up case report in the case file from the initial October 13, 2021 incident report, stating that she had spoken with ISP, who informed her that Ehret had contacted ISP to investigate Thompson's alleged sexual assault that occurred the night of October 12 to 13, 2021 (Filing No. 254-1 at 4). Lieutenant Schmuhl wrote in her report that ISP advised Ehret that the case belonged to IUPD and that ISP would pass the information along to IUPD. *Id.* Lieutenant Schmuhl wrote that she reviewed the original report and checked campus video footage of the areas Thompson was seen by the jogger who reported her. *Id.* She also wrote that she checked with IUPD and Bloomington Police Department to see if either had picked up a sexual assault kit for Thompson or any anonymous kits, and neither had a record of any such kits. *Id.* at 4–5.

That same day, Ehret called ISP stating that she received a call back from a detective at ISP stating that IUPD "has the case." Ehret thought that statement was "strange" because the case "hadn't been reported." (Filing No. 252, Ex. U at 01:00–01:14, 04:04–04:11). Ehret reiterated that the sexual assault kit had been collected and noted that it "remained anonymous." *Id.* at 01:49–02:07. The ISP trooper with whom Ehret spoke explained that Ehret could report to ISP "as long as it [had not] been reported to another agency." *Id.* at 03:43–04:01. The ISP trooper informed Ehret that if IUPD had already started collecting evidence and had the sexual assault kit, the decision could be made that IUPD would continue to handle the case; or if IUPD had not yet started to investigate a crime, then ISP could start the investigation, take Thompson's report, and take over the evidence. *Id.* at 04:49–05:08.

The next day, IUPD Detective Joshua Sung ("Detective Sung") contacted Ehret, who stated that she had a "client" who had turned in an anonymous sexual assault kit but refused to confirm her client's name (Filing No. 254-1 at 6). Ehret informed Detective Sung that she had contacted ISP to investigate the assault, and then the call between Ehret and Detective Sung was disconnected. *Id.* A short time later, Ehret left a voice mail with IUPD stating again that she did not want IUPD to investigate the sexual assault and reiterated the fact that her client's sexual assault kit was anonymous. *Id.*

On April 1, 2022, Ehret sent a letter to the University's general counsel informing them that she intended to file a complaint with the Department of Education Office of Civil Rights. In the letter, Ehret wrote that

> Indiana University continues to exacerbate the harm its discriminatory and inexcusable treatment caused my client by refusing to give my client's anonymous sexual assault kit to the Indiana State Police. ISP and Indiana University explained to the undersigned counsel that Indiana University launched an investigation into my client's sexual assault – even though she refused in writing to report the sexual assault to Indiana University. As I explained to Indiana University's Associate General Counsel and the officer Indiana University's Associate General Counsel directed to call me, Indiana University should have no means of connecting an anonymous sexual assault kit to any individual, including my client. Yet, somehow, Indiana University has confirmed to the undersigned that Indiana University has tied my client's anonymous sexual assault kit to my client. Amongst many other serious concerns related to Indiana University's inappropriate and untenable treatment of one of its students, my client again reiterates she does not trust Indiana University to fairly, properly, and nondiscriminatorily investigate her sexual assault and asks Indiana University to provide what should be her anonymous sexual assault kit to the Indiana State Police for any further action.

(Filing No. 255-10 at 8–9). Ehret emphasized that "[t]he responding EMS readily identified the strong possibility that [her] client was the victim of sexual assault," and IUH "recognized [her] client was the victim of sexual assault and encouraged [her] client to allow a SANE to collect evidence of the suspected assault". *Id.* Ehret requested that the University preserve any and all documents or information that may be relevant or related in any way to "the assault of [her] client

9

and (b) the charges Indiana University made against [her] client in the October 21 Violation Letter, including but not limited to (1) any and all video footage from any portion of the Indiana University campus on 12 October and/or 13 October . . . and (8) any information related to assault(s) of any other student(s) similar to the assault of [her] client." *Id.* at 9–10.

On August 22, 2023, Thompson's new attorneys sent a letter to the University's general counsel reiterating the contention that, among other violations, the University had refused to allow ISP to investigate the alleged assault, and that the University should release all evidence in its possession of the alleged sexual assault, including the sexual assault kit and security video footage, to ISP (Filing No. 257-19 at 5). Thompson's attorney reiterated that Thompson had specifically asked IUPD not to investigate her alleged sexual assault. *Id.* at 4. This letter did not contain the anonymous sexual assault kit's identifying information. IUPD denies that it ever received the anonymous kit's identification number, including from ISP (Filing No. 243-17 at 61:13–15; Filing No. 254-1 at 4–6; Filing No. 167-3 at 2–3).

On October 13, 2023, Thompson filed a Complaint in state court, alleging violations of Title IX, Title VI, 42 U.S.C. § 1981, 42 U.S.C. § 1983, and intentional inflection of emotional distress against the University and several named defendants (Filing No. 1). Defendants removed the case to federal court on November 20, 2023. *Id.* On January 17, 2024, the University's general counsel instructed IUPD to preserve evidence relevant to this litigation but did not mention preserving any evidence of the alleged sexual assault, including the sexual assault kit (Filing No. 255-12 at 3–5).

On March 7, 2024, counsel for Thompson and the University attended an initial pre-trial conference with the Magistrate Judge (Filing No. 42). At the conference, Thompson's counsel discussed her request for injunctive relief and requested that the sexual assault kit be transferred

to ISP for processing. The University's counsel stated that they were unaware of a sexual assault kit identified as belonging to Thompson. The parties were ordered to meet and confer concerning the sexual assault kit. Thompson's attorney did not provide the identification number for Thompson's sexual assault kit following that initial pre-trial conference (Filing No. 264 at 14, Filing No. 254-7 at 17).

On April 4, 2024, the unreported sexual assault kit was disposed of as part of a routine periodic review of IUPD's long-term storage capacity, along with a group of other anonymous sexual assault kits that were also past the one-year preservation period and other items from inactive investigations (Filing No. 167-3 at 2, ¶ 7). Thompson's sexual assault kit was destroyed under the direction of the Monroe County Prosecutor's Office (Filing No. 254-7 at 17, Filing No. 243-16 at 7–8). Thompson notes that the sexual assault kit was destroyed per the direction of a criminal investigator at the Monroe County Prosecutor's Office rather than the prosecutor or deputy prosecutor (see Filing No. 317). On May 16, 2024, the University instituted a litigation hold on certain IU email accounts; but because Thompson and other individuals had left IU more than sixty days prior, their email accounts no longer existed pursuant to the University's retention policies and could not be preserved (Filing No. 257-31 at 3, 6–7, Filing No. 257-50 at 3). In addition, IUPD never requested that any card swipes for Thompson on building access logs be preserved from the night of October 12–13, 2021 so those records were not preserved.

The University learned that Thompson's sexual assault kit had been destroyed on July 3, 2024, after it received Thompson's medical records from IUH and was able to locate the identification number for the kit in those records (Filing No. 254-7 at 17, Filing No. 264 at 14). Thompson learned that her sexual assault kit had been destroyed on July 31, 2024, when she

received supplemental discovery responses from the University (Filing No. 254-7 at 17, Filing No. 256 at 13).

**C.      Procedural Background**

As a result of the University's treatment of her, Thompson experienced significant emotional distress (Filing No. 264 at 11–12). On October 8, 2024, Thompson filed the operative Second Amended Complaint against the University and individual trustees, alleging Count I: Discrimination based on Gender in violation of Title IX of the Education Amendments Act; Count II: Discrimination in violation of Title VI of the Civil Rights Act; Count III: Intentional Deprivation of Rights in violation of Section 1981 of Civil Rights Act; Count IV: Violation of 42 U.S.C. § 1983 and Fourteenth Amendment Rights; Count V: Intentional Infliction of Emotional Distress; Count VI: Retaliation in violation of Title IX of Education Amendments Act; Count VII: Breach of Contract (Filing No. 80). Following a motion to dismiss filed by the University, the Court dismissed Counts III, IV, VI, and VII (Filing No. 163). The individual trustee defendants were also dismissed from this action (Filing No. 232).

The claims that survived the motion to dismiss are: (Count I) Thompson's Title IX discrimination claim that the University violated its own policies by initiating a disciplinary proceeding against her inconsistent with how it would have treated a similarly situated white male; (Count II) Thompson's Title VI discrimination claim that the University violated its own policies by initiating a disciplinary proceeding against her inconsistent with how it would have treated a similarly situated white student; and (Count V) Thompson's claims of intentional infliction of emotional distress caused by the University's destruction of her sexual assault kit and its impedance of an investigation by ISP into her alleged sexual assault. *Id.*

## II.    LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation modified; alteration omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "Neither the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion

13

for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations modified).

### III.    DISCUSSION

The three claims pending are Count I: Discrimination based on Gender in violation of Title IX of the Education Amendments Act; Count II: Discrimination in violation of Title VI of the Civil Rights Act, and Count V: Intentional Infliction of Emotional Distress. Thompson argues that the University—rather than supporting and protecting her after she was found on IU's campus disoriented, unable to remember the previous evening, and partially nude—charged her with violations of the Code of Conduct, despite ample evidence of a sexual assault, including her reports of a sexual assault. She claims the University violated numerous policies, procedures, and usual practices by refusing to postpone or cancel the initial judicial conference despite its customary practice of doing so; treated her differently than male or Caucasian students; and recklessly inflicted distress.

The University moves for summary judgment on all three claims. In its briefing, the University addresses Counts I and II together before addressing Thompson's state law claims in Count V (Filing No. 245). The Court finds this organization reasonable and will address Thompson's claims accordingly.

### A.    Counts I and II: Title IX and VI Discrimination Claims

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Likewise, Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be

14

subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. In essence, Title VI and Title IX make the same guarantees. Because the statutes are so similar, "a decision interpreting one generally applies to the other." *Doe v. Galster*, 768 F.3d 611, 617 (7th Cir. 2014). This is the case here.

For Thompson to succeed on either her Title IX or VI discrimination claims, she must show that: (1) the educational institution received federal funding, (2) she was excluded from participation in or denied the benefits of an educational program, and (3) the educational institution in question discriminated against her based on either her race (Black) or her gender (female). *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854 (7th Cir. 2019). As the Court noted in an earlier order in this case, Thompson's claims can be categorized as "selective enforcement" claims (Filing No. 163 at 10), but "[a]ll . . . categories simply describe ways in which a plaintiff might show that" sex or race drove "a university's decision to discipline a student." *Doe v. Purdue Univ.*, 928 F.3d 652, 667–68 (7th Cir. 2019). It is undisputed that the University receives federal funding, so the first element is met. Therefore, the Court addresses only elements two and three, keeping in mind that the ultimate question is whether the University discriminated against Thompson.

### 1. Exclusion or Denial of an Educational Program

The University argues that Thompson cannot show that she was excluded from or denied the benefits of her education as required by Title IX and Title VI (Filing No. 246 at 22). The University lays out the quintessential Title IX case as it sees it; a student is accused of misconduct and suspended or terminated by the school after an investigation, and the discipline is the denial of education. Thompson was not disciplined, as the charges were dismissed after the meeting; therefore, she must make some other showing that the alleged discrimination denied her educational benefits. *Id.* (citing *Janquet v. Green Bay Area Cath. Educ., Inc.*, 996 F.3d 802, 810

(7th Cir. 2021)). The University argues that Thompson must show the investigation had a "concrete negative effect" on her education and adds that emotional distress alone is not enough. *Id.* (quoting *Gabrielle M. v. Park Forest-Chicago Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 823 (7th Cir. 2003) (no denial of education where plaintiff was "diagnosed with some psychological problems" but maintained performance in school)).

The University argues that the record is devoid of any evidence of lost educational opportunities. The Code meeting was held on October 27, 2021, and that same day, the charge was dismissed. November was the Thanksgiving break, and finals and graduation were held in mid-December. Nowhere in this time was there a loss of educational opportunities. The University relies on Thompson's deposition testimony to show that she was not denied any educational opportunities (Filing No. 244-1 at 223:7–8). Thompson admits that she was not barred from class, *id.* at 222:23–223:1, not barred from campus, *id.* at 223:2–3, and not restricted from any IU program, *id.* at 223:4–6. The University argues that Thompson attempts to cast her voluntary decision to delay law school for a year as a denial of educational benefits by the University (Filing No. 246 at 22), but the designated evidence shows that Thompson's dissatisfaction with her LSAT score was the reason she decided not to apply to any law schools until sixteen months after the University had dismissed the charges and closed the investigation, and the reason she decided to take the LSAT three more times to improve her score. *Id.* at 23.

In response, Thompson argues that her deposition testimony that she was not denied educational benefits was solicited as an answer on a question of law, so it has no legal effect (Filing No. 294 at 27 (citing *Dabertin v. HCR Manor Care, Inc.*, 68 F. Supp. 2d 998, 1000 (N.D. Ill. 1999) ("As a general rule, factual admissions are binding on a party as a judicial admission unless withdrawn or amended. Counsel's legal conclusions, however, are not binding as judicial

admissions. It is well established that judicial admissions on questions of law have no legal effect." (cleaned up)))). Thompson asserts that because of the University's mistreatment, she missed classes, avoided participating in events, only lived in Bloomington part time through the end of the semester, stopped socializing with her classmates, and did not attend her graduation ceremony. She surmises that the University therefore denied these benefits to her. *Id.* at 28. She adds that her delay in applying to law school was not because she was unqualified but rather because of the traumatic incident and because of the University's denial of educational opportunities. *Id.* at 29.

The Court is not persuaded by Thompson. Thompson has failed to show that she was excluded from or denied any educational benefits. While the Court sympathizes with what was clearly a traumatic experience for Thompson, her decisions to—in her own words—"miss[] classes; avoid[] participating in on-campus events and student activities; only live[] part-time in Bloomington through the end of the semester; stop[] socializing with nearly all her classmates; and avoid[] attending her own graduation ceremony at IU" do not support a finding that the University in any way prevented her from participating in or denied her any educational benefits. As the University points out, Thompson admitted in her deposition that she was not prohibited from going to class, not barred from campus, not restricted from any programming, not denied any opportunities, and not subjected to discipline (Filing No. 244-1 at 222:24–223:10). Further, the record shows that Thompson's deposition answers were not solicited as a matter of "legal conclusions." Rather, she responded honestly to questions about whether she was denied the above opportunities, and she confirmed that she was not. *See id.* Asking Thompson whether the University prevented her from attending classes or barred her from attending her graduation is a question of fact, not a matter of law.

But even if such admissions were not binding, Thompson has produced no evidence that she was denied any educational benefit by the University. To prove such a denial, she must show the investigation had a "concrete, negative effect" on her education. *See Gabrielle M.*, 315 F.3d at, 823 (citation omitted). Inaction, such as not attending classes, is not the equivalent of being prevented from attending class or performing that action. Emotional distress alone is not enough. *See id.* Although Thompson missed some classes and did not attend the graduation ceremony that December, she was still able to perform academically through final exams and graduate early. Accordingly, Thompson has not shown that she was excluded from participation in or denied any benefits of an educational program by the University.

## 2. <u>Discrimination Based on Race or Gender</u>

For Thompson to succeed on her federal claims, she must also produce evidence "permit[ting] a reasonable factfinder to conclude that [her] race . . . or other proscribed factor [such as her gender,] caused the . . . adverse [educational] action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). This Court has previously employed Title VII's burden-shifting framework to assess claims under Title VI and Title IX. *See Ndzana v. Ball State Univ.*, No. 22-cv-01540, 2024 WL 473711, at *19 (S.D. Ind. Feb. 7, 2024) (applying burden-shifting framework to Title VI claim); *see also Andriakos v. Univ. of S. Ind.*, 867 F. Supp. 804, 809 (S.D. Ind. 1992) (applying burden-shifting framework to Title IX claim); *Martin v. S. Ill. Univ. Sch. of Med.*, No. 16-cv-3294, 2017 WL 4780613, at *10 (C.D. Ill. Oct. 23, 2017) (citing *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315 n.8 (10th Cir. 2017) ("The *McDonnell Douglas* framework applies to Title IX sex discrimination cases.")). Accordingly, Thompson may proceed under either theory.

Under the burden-shifting framework from *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), "a plaintiff must first establish a prima facie case for discrimination," *Vichio v. US Foods,*

18

*Inc.*, 88 F.4th 687, 691 (7th Cir. 2023), which includes demonstrating that (1) she is a member of a protected class; (2) her performance met the school's legitimate, nondiscriminatory expectations; (3) she suffered an adverse educational action; and (4) similarly situated students outside of her protected class were treated more favorably. *Singmuongthong v. Bowen*, 77 F.4th 503, 507 (7th Cir. 2023); *Brewer v. Bd. of Trs. of Univ. of Ill.*, 479 F.3d 908, 921 (7th Cir. 2007) (adjusting the elements of *McDonnell Douglas* "for the educational context").

Thompson is a member of a protected class, and her academic performance (a 3.78 GPA with no disciplinary history) shows she met the school's legitimate nondiscriminatory expectations. Thompson argues the University discriminated against her in two ways: (1) the University violated its policies to punish her; and (2) did so in a manner that is inconsistent with how it punished similarly situated white male students. The Court will address each in turn.

### a.  The University's Policies

Thompson argues that the University violated its own policies by charging her without first investigating the merits of the charges (Filing No. 294 at 30). She argues the University violated its policy when it required her to attend a conference and the University refused to postpone the conference even after Ehret told the University that Thompson believed she had been sexually assaulted. The University demonstrated skepticism and scrutiny rather than a concern for her wellbeing when it asked invasive questions and attempted to poke holes in her story. And the University demanded that she allow IUPD to investigate the sexual assault and complete an alcohol abuse treatment program before it would drop her charges. She further contends that the University intentionally interfered with the investigation of her sexual assault when she reported her sexual assault to ISP by refusing to allow ISP to investigate. *Id.* at 31.

In its response brief, the University reiterates that the disciplinary charges were related primarily to public intoxication, and Thompson does not dispute that she consumed alcohol and tested 0.258 BAC. The University contends that it did not violate its own policy because it did not know of the sexual assault allegations until after the charges were issued, and the University advised Ehret that Thompson needed to bring up such allegations to the OSC for the amnesty policy to apply. The policy states that "students who report an incident . . . will not be disciplined" under the Code (Filing No. 246 at 24 (citing Filing No. 243-5)). However, such reporting of an incident "does not excuse a student from meeting with OSC, as confirmed by past [University] practice in alcohol-related cases." *Id.* (citing Filing No. 243-8 at 73:20–25, 111:19–114:15).

Thompson "cannot prove . . . discrimination by merely identifying mistakes or imperfections in the process." *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 793 (7th Cir. 2022) (citing *Doe v. Samford Univ.*, 29 F.4th 675, 688 (11th Cir. 2022) ("A deviation from a Title IX policy is not, in and of itself, a violation of Title IX.")). "[P]rocedural irregularities may support a finding of sex bias under Title IX if, in light of all the circumstances, a fact-finder is convinced that the defendant deviated from proper procedures not because of human error but by design, to . . . discriminate against the plaintiff." *Id.* at 793. While she disagrees with how the process was handled and maintains that the University should have simply discontinued all conversations with her about the incident the moment Ehret mentioned her sexual assault concerns, the fact that the University made Thompson come to a meeting is not enough to show that she was discriminated against.

Thompson is correct that students who report victimization will not be disciplined pursuant to the amnesty policy, but she admits that she was not disciplined (Filing No. 244-1 at 222:24–223:10). Further, her counsel's reporting of a potential sexual assault does not require the University to terminate all communications concerning the incident. The University held a

20

meeting, and the OSC did not move forward with the student misconduct charges, which the designated evidence shows is consistent with the University's practice in alcohol-related cases (Filing No. 243-8 at 114:10–115:19).

The Court agrees with Thompson that the University could have shown more compassion based on the circumstances, even before it knew of Thompson's concern that she may have been sexually assaulted. But this lack of compassion does not show discrimination. Thompson's contentions that the University officials asked "invasive questions" or "attempted to poke holes in her story" during the meeting is not enough. Even if true, skepticism or critical questioning—without a link to a protected class—is not discrimination. *Purdue*, 928 F.3d at 669 (requiring a link to sex bias, not merely a disbelief by the university). Such link is not present in this case. At most, Thompson claims that the University believed her to be "an alcoholic worthy of blame." (Filing No. 294 at 31). Such beliefs do not raise a triable issue concerning sex-based or race-based discrimination given the circumstances in this case.

### b.  <u>Similarly Situated Individuals</u>

Thompson has not shown that similarly situated students outside her protected class were treated more favorably. A similarly situated individual must be comparable "in all material respects so as to eliminate other possible explanatory variables." *Crain v. McDonough*, 63 F.4th 585, 592 (7th Cir. 2023) (cleaned up). "Other possible explanatory variables include '[d]ifferences in experience, education, and qualifications . . . so long as the [defendant] took them into account when making the relevant . . . decisions.'" *Ndanza*, 2024 WL 473711, at *20 (quoting *Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 802 (7th Cir. 2014) (alterations in original)).

This argument is easy to dispel, as Thompson does not provide a single comparator. Rather, nearly the entire section of her brief concerning similarly situated comparators argues why the

comparators the University proffers, who were treated the same as Thompson, are not adequate (*see* Filing No. 279 at 26–28). Logically, to survive summary judgment, a plaintiff alleging she was treated less favorably than similarly situated individuals must provide at least one similarly situated individual. *See Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 703 (7th Cir. 2012) ("The 'similarly situated' inquiry is a 'flexible, common-sense one,' but it at least requires that the plaintiff name a comparator outside her protected class." (internal citation omitted)). Thompson argues the inverse—that the University has not provided a sufficient comparator whom it treated similarly. This argument fails because Thompson has the burden of proof. It is not the University's burden to provide comparators. Thompson has failed to meet her burden of establishing a *prima facie* case of race or gender discrimination.

### c. **Pretext**

Finally, the University argues that even if Thompson could make out a *prima facie* case of discrimination, she cannot establish that its justifications were pretextual (Filing No. 246 at 27). To show pretext, Thompson must identify evidence that would permit a reasonable jury to conclude that the University's stated reasons for initially bringing the disciplinary charges and requiring Thompson to go to a meeting—her 0.298 BAC and state of undress while wandering IU's campus at 5:00 a.m.—were false or insincere. *See Crain*, 63 F.4th at 593–94. To meet this burden, Thompson must "identify such weaknesses, implausibilities, inconsistencies, or contradictions" in the University's stated reason "that a reasonable person could find [it] unworthy of credence." *Boumebdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007). "If [the University] honestly believed the reasons it gave, however, [Thompson] loses even if the reasons were foolish, trivial, or baseless." *Id.*

22

The University contends that the official involved in charging Thompson with Code violations relied on IUPD's report noting her 0.298 BAC, her state of undress when found by police, and her stated history of prior alcohol incidents (Filing No. 246 at 27 (citing Filing No. 243-9 at 93:9–94:25, 100:8–24)). The University adds that the official, an African American man, was unaware of Thompson's race or sex before meeting with her and deliberately avoided reviewing her file in advance to reduce any risk of bias. *Id.* (citing Filing No. 243-9 at 195:11–24, 201:4–15). The University contends that once it found out about Thompson's sexual assault allegations, it converted the hearing into a meeting to discuss her well-being, her safety, and/or the University's treatment of her.

In her response, Thompson asserts that the University's proffered reasons are pretextual because even though it claims that the official involved with charging her did not know of her race and gender expression prior to meeting her, IUPD's report mentions words such as "female," and references a "nude female." *Id.* at 35 (citing Filing No. 255-3 at 2). Thompson then asserts that due to how she was found, the University should have at least investigated sexual assault prior to charging her. But these stated reasons, both individually and considered as a whole, are not enough to establish pretext.

The Seventh Circuit has "set a high evidentiary bar for pretext." *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 894 (7th Cir. 2016). To demonstrate pretext, a plaintiff can present evidence showing that (1) the defendant was "more likely than not motivated by a discriminatory reason" or (2) the defendant's stated reason is not credible. *Alexander v. Wis. Dep't of Health & Fam. Servs.*, 263 F.3d 673, 682 (7th Cir. 2001) (quoting *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1039 (7th Cir. 1993)). When considering pretext at the summary judgment stage, "the only question before

[the Court] is whether the plaintiff has provided evidence from which a rational trier of fact could infer that the . . . stated reasons for taking the adverse action were lies." *Id.* at 683.

Here, no reasonable jury could conclude that the University's reasons were pretext. The inconsistency that the University official responsible for bringing the charges testified that he did not know Thompson's gender even though the reports mentioned a "nude female" is a minor inconsistency considering overwhelming evidence of the validity of the University's reasoning. And while Thompson alleges racial discrimination in her Second Amended Complaint, despite engaging in extensive discovery, she fails to designate any evidence to show that the University knew of her race prior to issuing the charges.

It is reasonable that an individual found mostly nude wandering campus in the early morning with a BAC of 0.298 might be charged under the Code and required to at least attend a meeting. As the University points out, it has acted similarly with various other alcohol related cases on campus (Filing No. 246 at 25).[1] Nine other students were charged with public intoxication and/or lewd behavior in the 2021–2022 academic year. Of the nine students, seven are white, one is Latino, one is American Indian; one is female. The University held a judicial conference in all nine cases and held final hearings in eight, with the ninth hearing having been scheduled. Six of the nine students were found responsible for misconduct, with three of those six including an alcohol or substance use "intervention referral." (Filing No. 244-2 at 6).

It is undisputed that IUPD's initial report did not mention a potential sexual assault. When the University later learned of Thompson's alleged sexual assault, it converted the hearing into a meeting to focus on Thompson's well-being and available resources. This comports with the

---

[1] The Department of Education's Office of Civil Rights also determined that there was no evidence of sex or race discrimination or evidence that similarly situated students were treated more favorably than Thompson (*see* Filing No. 246 at 25–26; Filing No. 244-2 at 7).

University's common practice of meeting with students eligible for amnesty and giving them resources related to the student's particular situation (Filing No. 243-8 at 111:19–114:15). Given the circumstances and the overwhelming evidence that the University acted within reason, a reasonable jury could not conclude that the University's proffered reasons were pretext.

Finally, Thompson has failed to produce evidence "permit[ting] a reasonable factfinder to conclude that [her] race . . . or other proscribed factor [such as her gender,] caused the . . . adverse [educational] action." *Ortiz*, 834 F.3d at 765. Without any evidence—direct or circumstantial—to support a reasonable inference of discriminatory motive, a jury could not find that the University's actions were based on Thompson being Black or female.

Because Thompson has failed to show that she was prohibited from participation in or denied any benefits of an educational opportunity, failed to show that the University discriminated against her on account of her race (Black) or her sex (female), and failed to show that the University's proffered reasons for its actions were pretext, Counts I and II fail, and summary judgment is **granted** as to these claims.

**B.      Count V: Intentional Infliction of Emotional Distress**

This brings the Court to Thompson's Intentional Infliction of Emotional Distress ("IIED") claims. To establish a claim for IIED, a plaintiff must plead that a defendant: "(1) engaged in extreme and outrageous conduct; (2) which intentionally or recklessly; (3) caused; (4) severe emotional distress to another." *Rihm v. Hancock Cnty. Libr.*, 954 F. Supp. 2d 840, 858 (S.D. Ind. 2013). In discussing IIED claims, Indiana courts consistently quote the Restatement (Second) of Torts with approval, which states:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member

of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Bah v. Mac's Convenience Stores, LLC*, 37 N.E.3d 539, 550 (Ind. Ct. App. 2015).

The Court previously dismissed this claim to the extent Thompson challenged the University's handling of disciplinary proceedings or alleged refusal to investigate, holding such allegations fall short of extreme and outrageous conduct (Filing No. 163 at 16). The allegations that remain are that the University: (1) destroyed Thompson's sexual assault kit; and (2) impeded an ISP investigation. *Id.*; (Filing No. 80). Before turning to the merits, the Court will address the University's contentions that Thompson's claims fail under the Indiana Tort Claims Act's ("ITCA") notice requirement and immunity provisions (Filing No. 246 at 28), though the Court need not address these procedural grounds because Thompson's claims fail on the merits.

### 1.  Notice Requirement of ITCA

The ITCA states that "a claim against a political subdivision," like a "state educational institution" such as the University, "is barred unless notice is filed with . . . the governing body of that political subdivision . . . within one hundred eighty (180) days after the loss occurs." (Ind. Code § 34-13-3-8). This clock starts with the injury. *Lowe v. N. Ind. Commuter Transp. Dist.*, 177 N.E.3d 796, 798 (Ind. 2021). Notice is a "condition precedent to filing a tort suit." *Calvin v. Schauer*, No. 23-cv-230, 2023 WL 8275900, at *2 (N.D. Ind. Nov. 2023) (quoting *Weaver v. Elkhart Cmty. Sch. Corp.*, 95 N.E.3d 97, 101 (Ind. Ct. App. 2018)). "Once a defendant raises the failure to comply with the ITCA, the burden shifts to the plaintiff to prove compliance." *Id.* (cleaned up). "[F]ailure to comply with the ITCA's notice requirements requires dismissal." *Weaver*, 95 N.E.3d at 101.

The University argues that Thompson failed to file a tort claim notice within 180 days after the "loss" occurred (Filing No. 246 at 29). Specifically, the University argues that Thompson

26

discovered the loss—the destruction of her sexual assault kit—on July 31, 2024, but filed no notice describing it until April 25, 2025.

In her response brief, Thompson argues that she filed a tort claim notice on April 1, 2022, well before the destruction of the sexual assault kit (Filing No. 294 at 37). Thompson claims that this prior tort claim notice was "sufficiently clear to allow the University 'to ascertain the full nature of the claim against it so that it can determine its liability and prepare a defense.'" *Id.* (quoting *Collier v. Prater*, 544 N.E.2d 497, 500 (Ind. 1989)). In addition, Thompson argues that she filed a Motion for Sanctions for Spoliation of Evidence against the University on December 20, 2024, putting the University on notice of her claims concerning the destruction of the sexual assault kit.

The Court agrees with the University. First, the April 1, 2022, tort claim notice could not have put the University on notice of a claim arising from the April 4, 2024 destruction of the sexual assault kit. Indeed, "[i]n order to constitute substantial compliance, the notice must not only inform the State of the facts and circumstances of the alleged injury but must also advise of the injured party's intent to assert a tort claim." *Ricketts v. State*, 720 N.E.2d 1244, 1246 (Ind. Ct. App. 1999) (emphasis removed). For obvious reasons, a notice cannot "inform [the University] of the facts and circumstances of the alleged injury" if the facts and circumstances concerning the alleged injury have not yet occurred.

Thompson points the Court to *Evansville v. Rieber*, 385 N.E.2d 217 (Ind. Ct. App. 1979), in which an additional tort claim notice was not required because the plaintiffs "inform[ed] City of the nature of their claim" and "practically begged City to investigate the drainage problem and all circumstances surrounding the damage that [plaintiffs] suffered." (Filing No. 294 at 37 (quoting *Reiber*, 385 N.E.2d at 261)). This case is distinguishable from *Rieber* because Thompson specifically told the University that she did not want it to investigate or even have access to

information concerning her sexual assault kit. Thompson and her counsel actively prevented the University from investigating the circumstances concerning the sexual assault kit by choosing not to give the University any information that could identify the kit and consistently reiterated that they did not want the University to investigate, which is Thompson's right to do.

Nonetheless, a tort claim notice mentioning an object—which the defendant is precluded by the plaintiff from identifying—cannot be sufficient notice for all future claims concerning events that have yet to happen surrounding that object. The April 1, 2022 tort claim notice merely mentioned that a sexual assault kit existed, but it did not disclose any identifying information and was not "sufficiently clear" to allow the University "to ascertain the full nature of the [future] claim against it so that it can determine its liability and prepare a defense." *Collier*, 544 N.E.2d at 500. The only remaining question is whether the Motion for Sanctions for Spoliation of Evidence constituted substantial compliance with the ITCA's notice requirement. The Court finds that it does not.

"Substantial compliance with the statutory notice requirements is sufficient when the purpose of the notice requirement is satisfied." *Schoettmer v. Wright*, 992 N.E.2d 702, 707 (Ind. 2013). "The purposes of the notice statute include informing the officials of the political subdivision with reasonable certainty of the accident and surrounding circumstances so that [the] political [sub]division may investigate, determine its possible liability, and prepare a defense to the claim." *Id.* (quoting *Collier*, 544 N.E.2d at 499) (alterations in original). Moreover, the ITCA provides that a plaintiff "may not initiate" a lawsuit before the earlier of the political subdivision denying the claim or 90 days passing without approval. Ind. Code §§ 34-13-3-11, -13.

Thompson's Motion for Sanctions does not substantially comply with the ITCA because she filed her Second Amended Complaint, which included her IIED claim for disposal of the sexual

28

assault kit, two months before she filed the sanctions motion (*see* Filing No. 80 (10/8/2024 2d Am. Complaint adding disposal challenge); Filing No. 153 (12/20/2024 sanctions motion)). Thompson essentially asks the Court to hold that any motion that would put a political subdivision on notice of a tort claim constitutes substantial compliance, even if the motion is filed after the tort claim against the subdivision. Such a construction of the statute is unreasonable. As the Court stated above, notice is a condition precedent to filing suit. Accordingly, Thompson must have notified the University of her intention to bring her IIED claim concerning the disposal of her sexual assault kit and the University's alleged impeding of an investigation prior to filing these claims. She did not do so, and her IIED claims are therefore barred by the ITCA.

2.  **Immunity Provisions of ITCA**

The ITCA also provides immunity for governmental entities from losses relating to certain activities. The ITCA immunities are enumerated in Indiana Code Section 34-13-3-3. The ITCA "is comprehensive, and unless the activity giving rise to the tort falls within certain enumerated exceptions, governmental entities and their employees are subject to liability for torts they commit." *State v. Willits*, 773 N.E.2d 808, 814 (Ind. 2002).

"Whether the ITCA imparts immunity to a governmental entity is a question of law for the court to decide." *State v. Lucas*, 223 N.E.3d 253, 258 (Ind. Ct. App. 2023) (cleaned up). "The question may require an extended factual development, but the essential inquiry is whether the challenged act is the type of function which the legislature intended to protect with immunity." *City of Indianapolis v. Duffit*, 929 N.E.2d 231, 236 (Ind. Ct. App. 2010). "The party seeking immunity bears the burden of proving that its conduct falls within the provisions of the ITCA." *Schon v. Frantz*, 156 N.E.3d 692, 699 (Ind. Ct. App. 2020). "Because the ITCA is in derogation of the common law, it must be strictly construed against limitations on a claimant's right to bring

suit." *Lucas*, 223 N.E.3d at 258–259 (citing *Schoettmer*, 992 N.E.2d at 706). The Indiana Supreme Court has emphasized that "[a]t common law and by statute, government *liability* for tortious conduct is the rule while immunity is the exception." *Id.* (quoting *Ladra v. State*, 177 N.E.3d 412, 416 (Ind. 2021)) (alteration and emphasis in original).

The University contends that it is immune from Thompson's IIED claims under Indiana Code §§ 34-13-3-3(a)(7), (8), (10), and (14) (Filing No. 246 at 29–30). The Court will address each in turn.

### a.   Section 34-13-3-3(a)(7)

Indiana Code § 34-13-3-3(a)(7) provides immunities for claims against a governmental entity for the performance of a discretionary function. Indiana courts "apply the 'planning-operational' test to determine whether a governmental entity has engaged in a discretionary function that is immune from liability under the ITCA." *Lucas*, 223 N.E.3d at 259.

> Under this test, if the decision of the governmental entity was a "planning" activity, that is a function involving the formulation of basic policy characterized by official judgment, discretion, weighing of alternatives, and public policy choices, then the decision is discretionary and immune under Indiana Code Section 34-13-3-3(a)(7). Government decisions about policy formation in which involve assessment of competing priorities, a weighing of budgetary considerations, or the allocation of scarce resources are also planning activities. On the other hand, if the function is "operational," for example decisions regarding only the execution or implementation of already formulated policy, the function is not discretionary under the statute and no immunity attaches.

*Id.* (cleaned up).

The University contends that the disposal of the sexual assault kit was a discretionary function (Filing No. 246 at 30). The University likens its planning activities on use of finite storage to Indianapolis's prioritization of sidewalk repair where a limited budget would not allow the repair of all sidewalks. *Id.* (citing *Duffit*, 929 N.E.2d at 236–42). Thompson responds by arguing that the

30

University fails to offer any evidence showing that storage was limited or that maintaining her kit alone would have cost anything (Filing No. 294 at 39).

The Court disagrees that the University is required to provide a specific cost/benefit analysis concerning Thompson's anonymous sexual assault kit but nonetheless finds that because this is a close call, and immunity is the exception, the University is not immune under this statute. While the policy decision to dispose of anonymous sexual assault kits after a certain amount of time is discretionary, the Court finds that this specific circumstance was more of an operational function, as the University stated that disposal is part of IUPD's routine practice. Thus, the University is not immune under this section.

### b. Section 34-13-3-3(a)(8)

Indiana Code § 34-13-3-3(a)(8) grants immunity from claims against a governmental entity for adoption and enforcement of or failure to adopt or enforce any law, including rules and regulations. "For purposes of [this section], 'enforcement' has been defined as 'those activities in which a government entity or its employees compel or attempt to compel the obedience of another to laws, rules or regulations, or sanction or attempt to sanction a violation thereof.'" *Savieo v. City of New Haven*, 824 N.E.2d 1272, 1275 (Ind. Ct. App. 2005).

The Indiana Supreme Court has held that the language of this Section "restricts immunity to the adoption and enforcement of laws (and a failure to do so) which are within the assignment of the governmental entity and the legislature intended that a governmental entity be immune only for failing to adopt or enforce a law that falls within the scope of the entity's purpose or operational power." *Johnson v. Marion Cnty. Coroner's Office*, 971 N.E.2d 151, 157–158 (Ind. Ct. App. 2012) (citing *King v. Ne. Sec., Inc.*, 790 N.E.2d 474, 482 (Ind. 2003)).

31

The University argues that it is immune under this provision for enforcement of such laws or protocols on kits or confidentiality (Filing No. 246 at 29). However, as Thompson argues, her claims concern the disposal of an anonymous sexual assault kit and alleged intentional interference with an investigation not on whether the University adopted or failed to follow a specific law. Accordingly, this provision does not provide immunity.

### c.  Section 34-13-3-3(a)(10)

Indiana Code § 34-13-3-3(a)(10) bars claims concerning "[t]he act or omission of anyone other than the governmental entity or the governmental entity's employee." The University contends that it cannot be liable for Thompson's decision not to tell IUPD her anonymous kit's identifying information or for the local prosecutor office's order that the kit be destroyed (Filing No. 246 at 30). However, a question of fact remains concerning who directed the disposal of the sexual assault kit. The University has submitted evidence that the kit was disposed of at the direction of the Monroe County Prosecutor's Office (Filing No. 243-16 at 199:14–22), but Thompson has submitted evidence that IUPD employees were involved in the destruction of the anonymous sexual assault kit as well (Filing No. 267-7 at 49:20–51:16). Thus, the Court cannot say that as a matter of law Thompson's claims concern the act or omission of solely anyone other than the University or its employees, and this provision does not provide immunity.

### d.  Section 34-13-3-3(a)(14)

Indiana Code § 34-13-3-3(a)(14) provides immunity for a "misrepresentation if unintentional." The University asserts that this provision provides immunity for Thompson's IIED claims but Thompson's claims do not concern a misrepresentation. The parties also seem to agree that this section does not apply, as neither develops an argument beyond simply mentioning it. Accordingly, this provision does not provide immunity.

### 3. **Merits of Thompson's IIED Claims**

This brings the Court to the merits of Thompson's IIED claims. For Thompson to succeed on her IIED claims, she must show that the University "(1) engage[d] in extreme and outrageous conduct that (2) intentionally or recklessly (3) cause[d] (4) severe emotional distress to [Thompson]." *Bd. of Trs. of Purdue v. Eisenstein*, 87 N.E.3d 481, 500–01 (Ind. Ct. App. 2017). The "burden of proof is high and liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *AutoXchange.com, Inc. v. Dreyer & Reinbold, Inc.*, 816 N.E.2d 40, 52 (Ind. Ct. App. 2004); *see also Bah*, 37 N.E.3d at 550. The University contends that Thompson's claims fail on the first and second elements.

### a. **Intentional or Reckless Conduct**

An IIED claim's "basis" is "the intent to harm the plaintiff emotionally." *Lachenman v. Stice*, 838 N.E.2d 451, 456–57 (Ind. Ct. App. 2005). "[C]ausing a person to have emotional distress divorced from an intention to cause emotional distress cannot be a basis for an IIED claim." *Doe v. Ind. Wesleyan Univ.*, No. 20-cv-00039, 2020 WL 2474483, at *10 (N.D. Ind. May 12, 2020) (citing *Bah*, 37 N.E.3d at 550).

On April 4, 2024, pursuant to Indiana Code § 16-21-8-10,[2] Thompson's sexual assault kit was ordered disposed or destroyed by a criminal investigator at the Monroe County Prosecutor's Office—under the direction of the Monroe County Prosecutor's Office—along with several other sexual assault kits that had been held for over one year and one month (Filing No. 246 at 19, 30; Filing No. 243-16; Filing No. 243-25). Regardless of who directed the disposal, the University argues that it did not have the requisite intent for either the kit's disposal or the alleged impeding

---

[2] In 2024, Indiana Code 16-21-8-10 mandated that law enforcement must collect sexual assault examination kits from medical providers within 48 hours of notification and store them in secure, authorized storage for at least one year.

33

of ISP's investigation. Specifically, the University contends that the evidence shows that it had no way of identifying the kit until after it was disposed of because Thompson would not provide the necessary information (Filing No. 246 at 32).

Thompson points out that conduct supporting her IIED claims may be intentional or reckless (Filing No. 294 at 40). Indiana courts have interpreted "recklessly" as the Restatement does—"deliberate disregard of a high probability that emotional distress will follow." *Bradley v. Hall*, 720 N.E.2d 747, 753 n. 6 (Ind.Ct.App.1999).Tompson asserts that the University was aware of the sexual assault kit, since it had received at least six preservation requests and was served with a lawsuit addressing IUPD's possession of the sexual assault kit, yet it did nothing to locate or preserve the sexual assault kit and, thus, was reckless. *Id.*

Thompson's allegations that the University intentionally destroyed her sexual assault kit and actively impeded an investigation by ISP survived the initial hurdle of a motion to dismiss as the Court was required to accept as true all factual allegations in the complaint and draws all inferences in favor of the plaintiff. *Bielanski v. Cnty. of Kane*, 550 F.3d 632, 633 (7th Cir. 2008). (Filing No. 163 at 16). However, summary j judgment is the "put up or shut up" time in litigation, when the non-moving party must present their evidence—or "show their cards" to prove a genuine issue for trial exists. *Hammel v. Eau Galle Cheese Factory,* 407 F.3d 852, 859 (7th Cir. 2005).

Despite extensive discovery in this case, the designated evidence does not show that the University engaged in extreme or outrageous conduct, be it reckless or intentional. Thompson unequivocally has the right to keep her kit anonymous and preclude the University from identifying it. However, she may not do so and then bring an IIED claim on the basis that the University should have violated that confidentiality to identify and preserve the kit. As Thompson has argued many times throughout this case, including at oral argument, only Thompson, her

34

attorney, and IUH had the identifying information necessary to identify the kit. At no point before disposal did IUPD or the University have access to information which could identify the anonymous sexual assault kit. Her argument that the University, IUPD and IUH are all the same fails because IUH, as a hospital, has a separate legal and ethical responsibility to maintain patient confidentiality. Thompson's claims that she sent preservation requests is unpersuasive because a preservation request demanding preservation of an object that a plaintiff precludes the defendant from identifying is hardly a preservation request at all. Said differently, telling the University it must preserve all evidence irrespective of whether it relates to Thompson is untenable.

In addition, Thompson has presented no evidence that the kit was intentionally destroyed by the University. She was explicitly told that her anonymous sexual assault kit would be preserved for at least a year and then would be subject to destruction consistent with the University's SART protocol (*see* Filing No. 243-5 at 67 (explaining that victims should receive "notice that evidence collected from a non-reporting adult will be held anonymously for the period of one year and then destroyed.")). The fact that IUH notified Thompson of this protocol and that IUPD followed it cannot be the basis for an IIED claim.

The Court is not making a determination of when or whether sexual assault kits should or should not be destroyed. Rather, the Court finds that the University's destruction of a group of anonymous sexual assault kits after more than a year, which was consistent with the University's SART protocol and conveyed to Thompson, after Thompson declined to provide information needed to identify her kit, cannot be the basis for an IIED claim.

Turning to the alleged impeding of an ISP investigation, this claim fails for the same reasons Thompson's kit disposal claim fails. Thompson argues that the University prevented ISP from investigating her assault because the University did not provide ISP with the anonymous kit.

35

But again, this argument is premised on the assertion that the University should have and could have violated the confidentiality Thompson herself was entitled to. It is unreasonable to conclude that the University "impeded an investigation" by not providing evidence which Thompson precluded it from identifying, and it is implausible to find that such an action could reach the high threshold required for an IIED claim.

A plaintiff cannot claim IIED by a police department for failure to provide evidence that the plaintiff herself is actively precluding the police department from identifying. Further, Thompson does not have a constitutional right to an investigation let alone a right to choose which police department investigates and to what level of satisfaction. *Rossi v. City of Chicago*, 790 F.3d 729, 735 (7th Cir. 2015) (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989) (holding that the Constitution "generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary secure life, liberty, or property interests of which the government itself may not deprive the individual." (alteration in original))). Thus, Thompson's claim for alleged impeding of an investigation fails as well.

The University has not been shown to have the requisite intent for Thompson to sustain an IIED claim for either the disposal of her anonymous sexual assault kit or for allegedly impeding an investigation. Accordingly, her IIED claims fail on the second element, and the University's Motion for Summary Judgment is **granted** for these claims.

### b. Extreme or Outrageous

Though the Court need not address the extreme and outrageous element, it will do so briefly as Thompson's IIED claims fail under this element as well. As stated above, extreme and outrageous conduct is a distinct element which is defined narrowly; liability has been found *only*

36

where the conduct is so extreme and so outrageous that it goes beyond all possible bounds of decency. *AutoXchange*, 816 N.E.2d at 52.

Thompson argues that "despite receiving numerous preservation requests, a tort claim, demand letters, a Department of Education complaint and a lawsuit, [the University] never asked [Thompson] for identifying information associated with her kit." (Filing No. 280 at 37). She argues the University never told her no investigation would be permitted unless she allowed IUPD to investigate the sexual assault and, most outrageously, despite knowing of her lawsuit and discussing the sexual assault kit during the initial pretrial conference, the University destroyed her sexual assault kit. *Id.* at 37.

None of these actions is sufficiently extreme or outrageous. First, courts have repeatedly held that a university's failure to conduct a proper investigation does not rise to the level of extreme and outrageous conduct needed to establish an IIED claim. *See, e.g.*, *Doe v. The Trustees of the Univ. of Pa.*, 270 F. Supp. 3d 799, 827 (E.D. Pa. 2017) (finding that allegations that university officials distorted the facts of an alleged sexual encounter, improperly attacked plaintiff's credibility, unjustifiably branded plaintiff a rapist, threatened plaintiff with expulsion when expulsion was not justified, and ultimately imposed an unfair sanction was not the type of "desperate and ultra extreme conduct" that would give rise to an IIED claim); *see also Doe v. Ind. Wesleyan Univ.*, 2020 WL 2474483, at *9–10; *Doe v. Univ. of S. Ind.*, No. 21-cv-00144, 2024 WL 1256039, at *9 (S.D. Ind. Mar. 25, 2024). This case does not even rise to the level of the above cited cases.

Second, there is nothing concerning handling of the anonymous kit which goes beyond all possible bounds of decency to be utterly intolerable in a civilized community. IUH provided notice that anonymous sexual assault kits are held for a year and then destroyed. IUPD received the kit,

held it in evidence, and respected Thompson's wishes for the kit to remain anonymous. There is no evidence that the University attempted to identify Thompson's sexual assault kit—which would have breached her right to confidentiality—despite her later arguments that it should have violated her confidentiality. Thompson concedes that she (and her counsel) understood the statutory retention period, yet gave IUPD no information to identify any kit as hers during that time. The kit remaining in IUPD storage until disposal was "pursuant to . . . policy" (and aligned with statute), and was not "extreme and outrageous." There is nothing extreme or outrageous about the University complying with protocols and respecting confidentiality.

While the Court sympathizes with Thompson for the outcome of her anonymous sexual assault kit being destroyed, there is no basis to conclude that such an outcome under the circumstances was sufficiently extreme and outrageous to warrant an IIED claim. Accordingly, her IIED claims fail on this element as well.

Thompson has failed to meet her burden of showing that there is a genuine dispute of material fact with respect to her IIED claims, and summary judgment is also **granted** on this claim.

## IV.   CONCLUSION

For the reasons discussed above, Defendant Trustees of Indiana University's Motion For Summary Judgment (Filing No. 242) is **GRANTED**. The remaining claims of Thompson's Second Amended Complaint, Count I: Discrimination based on Gender in violation of Title IX of the Education Amendments Act; Count II: Discrimination in violation of Title VI of the Civil Rights Act; and Count V: Intentional Infliction of Emotional Distress, are **dismissed with prejudice**.

Final judgment shall issue separately.

**SO ORDERED**.

Date:   4/20/2026

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

38

Distribution:

Sandra L. Blevins
Betz & Blevins
sblevins@betzadvocates.com

Courtney E. Endwright
BETZ & BLEVINS
cendwright@betzadvocates.com

Amanda Jane Gallagher
Barnes & Thornburg LLP
Amanda.Gallagher@btlaw.com

Jamie A. Maddox
BETZ & ASSOCIATES
jmaddox@betzadvocates.com

John R. Maley
BARNES & THORNBURG, LLP (Indianapolis)
jmaley@btlaw.com

Dylan Pittman
BARNES & THORNBURG, LLP (Indianapolis)
dylan.pittman@btlaw.com

Harley Brianna Schmitt
Betz & Blevins
hschmitt@betzadvocates.com

Charity Seaborn
Barnes & Thornburg LLP
Charity.Seaborn@btlaw.com